## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENCYCLOPÆDIA BRITANNICA, INC., and MERRIAM-WEBSTER, INC.,<br><br>          Plaintiffs,<br><br>     v.<br><br>OPENAI, INC., OPENAI LP, OPENAI GP, LLC, OPENAI, LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION, LLC, OPENAI HOLDINGS, LLC, and OPENAI GROUP PBC,<br><br>          Defendants. | Civil Action No.  1:26-cv-2097<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Encyclopædia Britannica, Inc. ("Britannica") and Merriam-Webster, Inc. ("Merriam-Webster" and, collectively with Britannica, "Plaintiffs"), by and through their attorneys, respectfully bring this Complaint against Defendants OpenAI, Inc.; OpenAI LP; OpenAI GP LLC; OpenAI LLC; OpenAI OpCo LLC; OpenAI Global LL; OAI Corporation, LLC; OpenAI Holdings, LLC; and OpenAI Group PBC (collectively, "OpenAI" or "Defendants") and allege as follows:

## NATURE OF THE ACTION

1.      Britannica is a household name synonymous with trusted, fact-checked, meticulously researched content. Since its beginnings over 250 years ago as a publisher of hard-copy encyclopedias, it is now a global digital education and information platform that delivers knowledge to students, educators, and learners of all ages with innovative digital instructional and informational solutions.

2.    Britannica also owns Merriam-Webster, Inc., which has been America's leading provider of language information for more than 180 years. Merriam-Webster's websites, apps, and social media channels offer guidance to tens of millions of visitors every month. In print, Merriam-Webster's publications include Merriam-Webster's Collegiate Dictionary, which is among the best-selling books in American history, as well as dictionaries for English-language learners.

3.    With personalized, adaptive instructional solutions and a rich array of articles, videos, photos, interactives, games, and quizzes, Plaintiffs empower people everywhere to learn, explore, and engage. To continue developing the high-quality content for which they have come to be known, Plaintiffs invest in the talent and effort of human researchers, writers, editors, and creators to produce trusted digital content.

4.    There is a high demand for Britannica and Merriam-Webster's high-quality content. Plaintiffs fund their investment in that content through user subscriptions, as well as advertising revenue that funds the creation of Britannica's and Merriam-Webster's content.

5.    OpenAI "is an AI research and deployment company," and it states that its "mission is to ensure that artificial general intelligence benefits all of humanity."[1] OpenAI's flagship product, ChatGPT, an artificial intelligence chat platform that it first released in 2022, has driven OpenAI to a valuation of $730 billion.[2] ChatGPT generates narrative responses to users using large language models ("LLMs") that OpenAI trained "on vast amounts of data from the internet written by humans," so that ChatGPT's responses "may sound human-like."[3] ChatGPT also accesses the Internet to supplement the knowledge bases of the LLMs and provide users with "better answer[s]"

---

[1] OpenAI, *About*, https://openai.com/about/ (last accessed March 13, 2026).
[2] OpenAI, *Scaling AI for everyone*, https://openai.com/index/scaling-ai-for-everyone/ (last accessed March 13, 2026).
[3] OpenAI, *What is ChatGPT?*, https://help.openai.com/en/articles/9260256-chatgpt-capabilities-overview (last accessed March 13, 2026).

compared to traditional search engine research, which "often requires multiple searches and digging through links to find quality sources and the right information for you."[4]

6.      Defendants' ChatGPT-based AI products free ride on Plaintiffs' trusted, high-quality content—made possible through the diligent work of human researchers, writers, editors, and creators—by cannibalizing traffic to Defendants' websites with AI-generated summaries of Plaintiffs' own content. A traditional search engine takes in users' queries and returns search results that require users to travel to other webpages to explore information responsive to that query. A search result is thus an informational product that connects users to external webpages containing information or content relevant to their queries. Put differently, a search engine is an intermediary between users seeking information and web publishers who provide that information. A search engine thus generates clicks from users who click on search results to visit a web publisher's website. Web publishers like Plaintiffs rely on those clicks to sell subscriptions to users who seek to delve more deeply into some content, as well as selling advertising to third parties who seek to present their products or services before the publishers' users.

7.      Specifically, Defendants' ChatGPT-based AI products (referred to collectively as "ChatGPT") include Defendants' products that provide narrative text output using the GPT-3, GPT-4 or subsequent LLM models, including ChatGPT's consumer, business, and enterprise products and OpenAI's API platform. "ChatGPT" includes all functionality offered by those products, such as web search and deep research.

8.      ChatGPT starves web publishers like Plaintiffs of revenue by generating responses to users' queries that substitute, and directly compete with, the content from publishers like Plaintiffs. To build its substitute products, Defendants engage in massive copying of Plaintiffs'

---

[4] OpenAI, *Introducing ChatGPT search*, https://openai.com/index/introducing-chatgpt-search/ (last accessed March 13, 2026).

and other web publishers' copyrighted content without authorization or remuneration. Upon information and belief, ChatGPT has copied, and continues to copy, Plaintiffs' copyrighted content at massive scale—including both to train the LLM models that power ChatGPT and to supplement or ground that LLM's knowledge base, including through using a retrieval-augmented generation ("RAG") model. ChatGPT then provides narrative responses to user queries that often contain verbatim or near-verbatim reproductions, summaries, or abridgements of original content, including Plaintiffs' copyrighted works.

9.     Defendants' conduct violates Plaintiffs' exclusive rights under the Copyright Act in at least three ways:

- *First*, Defendants infringe Plaintiffs' copyrights when Defendants engage in mass-scale copying of Plaintiffs' copyrighted content to use to train its LLMs to provide outputs that mimic Plaintiffs' content.

- *Second,* Defendants infringe Plaintiffs' copyrights when Defendants *again* retrieve, copy, and use Plaintiffs' copyrighted content through its use of RAG systems to supplement the existing knowledge base of the LLM models.

- *Third,* Defendants also infringe Plaintiffs' copyrights when ChatGPT generates outputs that are substantially similar to Plaintiffs' content. ChatGPT's outputs to users contain full or partial verbatim reproductions of Plaintiffs' copyrighted articles; text that resembles, paraphrases, or summarizes Plaintiffs' copyrighted works; and/or text that mimics the selection and curation of content and lists in Britannica's copyrighted articles.

10.     In addition to its massive copyright infringement, Defendants also violate Plaintiffs' trademarks under the Lanham Act when ChatGPT generates made-up content or

"hallucinations" and falsely attributes them to Plaintiffs. Defendants likewise violate Plaintiffs' trademarks under the Lanham Act when ChatGPT misleadingly omits portions of Plaintiffs' content without disclosing those omissions and displays the incomplete and inaccurate reproductions alongside Plaintiffs' famous trademarks. In addition, Defendants' use of Plaintiffs' trademarks constitutes false designations of origin and confuses and deceives users into believing that the hallucinations and/or undisclosed omissions are associated with, sponsored by, or approved by Plaintiffs.

11.    The law does not permit OpenAI's systematic disregard for the rights and intellectual property of Britannica and Merriam-Webster. By this action, Plaintiffs seek to hold OpenAI responsible for the substantial harm it is causing and illicit profits it is reaping by infringing on Plaintiffs' copyrights and violating their trademark rights, and to protect the public's continued access to high-quality and trustworthy online information.

## THE PARTIES

12.    Plaintiff Encyclopædia Britannica, Inc. is a Delaware corporation with its headquarters and principal place of business at 325 N. LaSalle Street, Suite 200, Chicago, Illinois 60654.

13.    Plaintiff Merriam-Webster, Inc. is a Delaware corporation with its headquarters and principal place of business at 47 Federal Street, Springfield, Massachusetts 01105.

14.    Defendants are closely related Delaware entities that together operate as OpenAI. Defendant OpenAI Inc. is a Delaware nonprofit corporation with a principal place of business located at 3180 18th Street, San Francisco, California. OpenAI Inc. was formed in December 2015. OpenAI Inc. indirectly owns and controls all other OpenAI entities, including all other Defendants, and has been directly involved in carrying out the large-scale copyright infringement and

trademark violations alleged in this Complaint.

15.     Defendant OpenAI LP is a Delaware limited partnership with its principal place of business located at 3180 18th Street, San Francisco, California. OpenAI LP was formed in 2019. OpenAI LP is a wholly owned subsidiary of OpenAI Inc. that is operated for profit and is controlled by OpenAI Inc. OpenAI LP has been directly involved in carrying out the large-scale copyright infringement and trademark violations alleged in this Complaint.

16.     Defendant OpenAI GP, LLC is a Delaware limited liability company with a principal place of business located at 3180 18th Street, San Francisco, California. OpenAI GP, LLC is the general partner of OpenAI LP, and it manages and operates the day-to-day business and affairs of OpenAI LP. OpenAI GP LLC is wholly owned and controlled by OpenAI Inc. OpenAI, Inc. uses OpenAI GP LLC to control OpenAI LP and OpenAI Global, LLC. OpenAI GP, LLC has been directly involved in carrying out the large-scale copyright infringement and trademark violations alleged in this Complaint through its direction and control of OpenAI LP and OpenAI Global LLC.

17.     Defendant OpenAI, LLC is a Delaware limited liability company with a principal place of business located at 3180 18th Street, San Francisco, California. OpenAI, LLC was formed in September 2020. OpenAI LLC owns, sells, licenses, and monetizes a number of OpenAI's offerings, including ChatGPT, ChatGPT Enterprise, and OpenAI's API tools, all of which were built on OpenAI's large-scale copyright infringement and trademark violations alleged in this Complaint. Upon information and belief, OpenAI, LLC is owned and controlled by OpenAI Inc., through OpenAI Global LLC and OpenAI OpCo LLC.

18.     Defendant OpenAI OpCo LLC is a Delaware limited liability company with a principal place of business located at 3180 18th Street, San Francisco, California. OpenAI OpCo

LLC is a wholly owned subsidiary of OpenAI Inc. and has facilitated and directed OpenAI's large-scale copyright infringement and trademark violations alleged in this Complaint through its management and direction of OpenAI, LLC.

19.     Defendant OpenAI Global LLC is a Delaware limited liability company formed in December 2022. OpenAI Global LLC has a principal place of business located at 3180 18th Street, San Francisco, California. OpenAI, Inc. indirectly has a majority stake in OpenAI Global LLC through OpenAI Holdings LLC/OpenAI Group PBC and OAI Corporation, LLC. OpenAI Global LLC was and is involved in the large-scale copyright infringement and trademark violations alleged in this Complaint through its ownership, control, and direction of OpenAI LLC.

20.     Defendant OAI Corporation, LLC is a Delaware limited liability company with a principal place of business located at 3180 18th Street, San Francisco, California. OAI Corporation, LLC's sole member is OpenAI Holdings, LLC/OpenAI Group PBC. OAI Corporation, LLC was and is involved in the large-scale copyright infringement and trademark violations alleged in this Complaint through its ownership, control, and direction of OpenAI Global LLC and OpenAI LLC.

21.     Defendant OpenAI Holdings, LLC is a Delaware limited liability company with a principal place of business located at 3180 18th Street, San Francisco, California whose sole members are OpenAI, Inc. and Aestas, LLC, whose sole member, in turn, is Aestas Management Company, LLC. Aestas Management Company, LLC is a Delaware shell company that OpenAI used to execute a $495 million capital raise in 2023. According to OpenAI, Defendant OpenAI Holdings, LLC merged into OpenAI Group PBC effective December 31, 2025.

22.     Defendant OpenAI Group PBC is a Delaware benefit corporation with a principal place of business located at 3180 18th Street, San Francisco, California. OpenAI Group PBC was

incorporated in October 2025. According to OpenAI, Defendant OpenAI Holdings, LLC merged into OpenAI Group PBC effective December 31, 2025. Through that merger, OpenAI Group PBC is the successor to OpenAI Holdings, LLC's conduct as alleged in this Complaint, and is liable for harm caused by the conduct of its predecessor entities.

## JURISDICTION AND VENUE

23.    This civil action seeks damages, injunctive relief, and other equitable relief under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, and the Lanham Act, 15 U.S.C. § 1051 *et seq*.

24.    This Court has subject matter jurisdiction over this civil action under 28 U.S.C. §§ 1331 and 1338.

25.    As set forth in this section and further supported in the "Factual Allegations" below, this Court has personal jurisdiction over each of Defendants pursuant to New York Civil Practice Law and Rules § 302(a)(1)–(4) and the Due Process Clause of the U.S. Constitution. In multiple independently sufficient ways, Defendants have purposely availed themselves of the privilege of doing business in the State of New York and subjected themselves to New York's long-arm jurisdiction.

26.    Defendants use real property situated within this State and District, including large-scale office space in Manhattan, in order to conduct the business underlying the allegations in this Complaint. OpenAI leases 90,000 square feet of office space in Manhattan.[5] OpenAI advertises roles for its "NYC office" in which it states that "[w]e use a hybrid work model (3 days/week in the office) and offer relocation assistance for new employees," and currently displays over 60 open

---

[5] Peter Grant, *OpenAI Is Putting Down Office Roots in New York*, THE WALL STREET JOURNAL (October 4, 2024), https://www.wsj.com/real-estate/commercial/openai-is-putting-down-office-roots-in-new-york-86194c6c.

roles in "New York City."[6] LinkedIn searches indicate that OpenAI's New York staff has responsibilities directly relevant to the claims in this Complaint, including members of the technical, product, and marketing teams.[7] The Vice President of Media and Entertainment responsible for "OpenAI's engagement with media companies and content owners across" multiple industries is also based in New York.[8]

27.    Defendants distribute and license ChatGPT throughout this State and District to New York residents. Upon information and belief, OpenAI has sold subscriptions for multiple consumer, business, and enterprise tiers of ChatGPT to New York residents. Upon information and belief, Defendants derive substantial revenue from their business operations and services in this State and District. OpenAI recently stated that ChatGPT has "more than 900M weekly active users" and "more than 50 million consumer subscribers."[9] Upon information and belief, a significant number of these users and subscribers are located in this State and District. OpenAI also describes itself as "the fastest-growing business platform in history," and how it has over 9 million paid business customers.[10] Upon information and belief, a significant number of these users are located in this State and District. For example, OpenAI's business customers in New York include major companies headquartered and located in New York City such as Morgan Stanley, among many others.[11]

---

[6] *E.g.*, OpenAI, *AI Deployment Engineer, Technical Success – New York City*,
https://openai.com/careers/ai-deployment-engineer-new-york-city/ (last accessed March 13, 2026);
OpenAI, *Careers at OpenAI*, https://openai.com/careers/search/ (last accessed March 13, 2026).
[7] *E.g.*, Justin Bleuel, LinkedIn, https://www.linkedin.com/in/justinbleuel/ (last accessed March 13, 2026).
[8] Varun Shetty, LinkedIn, https://www.linkedin.com/in/mrvarunshetty/ (last accessed March 13, 2026).
[9] OpenAI, *Scaling AI for everyone* (February 27, 2026), https://openai.com/index/scaling-ai-for-everyone/.
[10] *Id.*; OpenAI, *1 million business customers: the fastest-growing business platform in history* (November 5, 2025), https://openai.com/index/1-million-businesses-putting-ai-to-work/.
[11] OpenAI, *Morgan Stanley uses AI evals to shape the future of financial services*,
https://openai.com/index/morgan-stanley/ (last accessed March 13, 2026).

28.     Plaintiffs' allegations in the Complaint relate directly to ChatGPT products and services distributed within this State and District to New York residents. For example, upon information and belief, ChatGPT's narrative outputs that mimic Plaintiffs' copyrighted works (due to Defendants' large-scale copying of Plaintiffs' content for the training and grounding of its LLM models that power ChatGPT) are generated to users located within this State and District. Additionally, upon information and belief, ChatGPT's narrative outputs that contain undisclosed omissions and/or fabricated content that ChatGPT attributes to Plaintiffs cause confusion among users in this State and District.

29.     Plaintiffs also have connections to this State and District. Britannica leases office space at 420 Lexington Avenue, New York, NY 10170. Britannica also partners with the New York Public Library to provide over 3 million students with access to (1) Britannica Academic (which includes access to Merriam-Webster's Collegiate Dictionary, magazines, and periodicals); (2) Britannica Escolar (which includes thousands of articles, videos, and primary sources in the Spanish language); and (3) Britannica School (which is the go-to source for K-12 students by offering each article at three reading levels to cater to diverse learning needs). Defendants harm Plaintiffs in this State and District because Plaintiffs have a high concentration of users in New York City.

30.     This Court has forum over this action because Defendants are already defending numerous lawsuits filed against them by prominent publishers and authors for similar copyright infringement and trademark violations, and the U.S. Judicial Panel on Multidistrict Litigation combined those cases into a pending multidistrict litigation in this State and District. *See In re: OpenAI, Inc. Copyright Infringement Litigation*, No. 1:25-md-3143 (S.D.N.Y). It is proper for this Court to adjudicate this action alleging similar misconduct within the same forum.

31.     Finally, venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(a). As described above, Defendants and/or their agents reside in this District and/or may be found in this State and District. In addition, a significant number of Defendants' users are located in this State and District. As a direct and proximate result of Defendants' unauthorized use and/or dissemination of Plaintiffs' copyrighted works and trademarks in New York and elsewhere, Plaintiffs have lost and will continue to lose revenue and profits from the markets for advertising, subscribers, visitors, and users.

## FACTUAL ALLEGATIONS

### I.     <u>Plaintiffs' Business, Copyrights, and Trademarks</u>

32.     For more than 250 years, Britannica has provided dynamic, continuously updated, and rigorously fact-checked information for students, teachers, and lifelong learners. After its founding in Edinburgh, Scotland, in 1768 as a hard-copy encyclopedia, Britannica has rapidly expanded its presence and pivoted to face an increasingly digital world to publish its well-known encyclopedias online. Britannica has undergone different ownership structures over the years. But its commitment to quality has not wavered.

33.     Today, Britannica is a trusted global digital education and information platform that delivers knowledge with innovative global solutions to strengthen student learning outcomes, assist educators, and inform and delight learners of all ages. Britannica has become a household name and provides not only its well-known encyclopedias, now digitally, but also a wide range of curriculum products, language-study courses, and readiness trainings. Britannica's brands include Britannica Education, which delivers instructional solutions that improve classroom outcomes for students and educators around the world; and Plaintiff Merriam-Webster, the United States's leading dictionary and preeminent authority on language and usage. Over 150 countries and 150 million students worldwide use Britannica's services today, and Britannica offers its content in

over 20 languages.

34.    Plaintiff Merriam-Webster, Inc. is a publisher of reference books and is most well-known for its publication of America's leading dictionary. Since its founding in 1831, Merriam-Webster has been the preeminent authority on the English language, including through its publication of print and digital dictionaries.

35.    Merriam-Webster remains an authority in teaching the public about the English language, often through its clever and engaging content that uses humor and wordplay to increase its pedagogic value. For instance, Merriam-Webster's Instagram account has over 950,000 followers and is highly praised for its engaging and informative content:



36.    Plaintiffs did not become trusted sources for digital factual and educational content by accident. Plaintiffs employ hundreds of employees—including writers, editors, researchers, and

content creators—to generate their original digital content. Plaintiffs rely on the effort, skills, and experience of this human talent to continue publishing their trusted, high-quality content. These staff not only decide *what* stories to tell but also *how* to tell them. They not only uncover facts but also present them in a way that will inspire curiosity and the joy of learning in Plaintiffs' readers and users.

37.     Britannica owns the copyright in at least 13 "collective works," as defined by 17 U.S.C. § 101, encompassing nearly 100,000 online articles, as well as the copyright in the print volumes of the New Encyclopaedia Britannica. The registration certificates applicable to these articles are attached as Exhibits 1-14 to this Complaint.

38.     Britannica is also the owner of a number of federally registered trademarks for the name "Britannica," including Registration Nos. 1,309,991 (registered Dec. 18, 1984); 2,287,468 (registered Oct. 19, 1999); 1,506,869 (registered Oct. 4, 1988); 3,762,013 (registered Mar. 23, 2010); 6,939,844 (registered Jan. 3, 2023); and 3,545,991 (registered Dec. 16, 2008).

39.     Merriam-Webster owns the copyright in the print volume of the Merriam-Webster Collegiate Dictionary (11th ed.). The registration certificate is attached as Exhibit 15 to this Complaint.

40.     Merriam-Webster is the owner of several federally registered trademarks for the name "Merriam-Webster," "Merriam-Webster's," and "Merriam-Webster's Collegiate," stylized in different manners, including Registration Nos. 4,382,837 (registered Aug. 13, 2013); 7,551,078 (registered Oct. 29, 2024); 4,763,361 (registered Jun. 30, 2015); 1,762,800 (registered Apr. 6, 1993); 4,763,362 (registered Jun. 30, 2015); 1,826,345 (registered Mar. 15, 1994); and 1,826,344 (registered Mar. 15, 1994).

## II.    OpenAI's Generative AI Technology

41.    OpenAI has become one of the most valuable companies in technology today through the massive success of ChatGPT. ChatGPT has over 900 million weekly users, 50 million consumer subscribers, and 9 million business subscribers.[12] OpenAI recently announced over $100 billion in investment consisting of $30 billion investments from SoftBank and NVIDIA and a $50 billion investment from Amazon, for a total valuation of $730 billion, and reportedly has annual revenue as high as $25 billion.[13]

42.    The foundation of OpenAI's success, and the technology that powers ChatGPT, is OpenAI's large language models, or LLMs, which OpenAI sometimes refers to as "foundation models."[14] LLMs work by predicting words that are likely to follow a given string of text based on the potentially billions of examples used to train the LLM to make such predictions. OpenAI states that its models were trained "on vast amounts of data from the internet written by humans."[15] OpenAI explains that, "[d]uring training, the model analyzes relationships within this data—such as how words typically appear together in context—and uses that understanding to predict the next most likely word when generating a response, one word at a time."[16] When generating outputs, LLMs use algorithms to weigh the relevance of different parts of the input data.

---

[12] OpenAI, *Scaling AI for everyone* (February 27, 2026), https://openai.com/index/scaling-ai-for-everyone/.

[13] *Id.*; Reuters, *OpenAI tops $25 billion in annualized revenue, The Information reports* (March 4, 2026), https://www.reuters.com/technology/openai-tops-25-billion-annualized-revenue-last-month-information-reports-2026-03-05/.

[14] OpenAI, *How ChatGPT and our foundation models are developed*, https://help.openai.com/en/articles/7842364-how-chatgpt-and-our-foundation-models-are-developed (last accessed March 13, 2026).

[15] OpenAI, *What is ChatGPT?*, https://help.openai.com/en/articles/9260256-chatgpt-capabilities-overview (last accessed March 13, 2026).

[16] OpenAI, *How ChatGPT and our foundation models are developed*, https://help.openai.com/en/articles/7842364-how-chatgpt-and-our-foundation-models-are-developed (last accessed March 13, 2026).

43.    After training, LLMs can generate "human-like" text by taking a seed input (e.g., a question or prompt) and iteratively predicting the most likely next word based on the patterns it has learned. Through this process, LLMs can generate answers to questions about information that is included in their training data. They are also capable of taking documents as input, then summarizing or answering questions about those documents. The quality of the output depends on the size of the model, the diversity of training data, and the specific architecture and training techniques used.

44.    OpenAI states that its "foundation models, including the models that power ChatGPT, are developed using three primary sources of information: (1) information that is publicly available on the internet, (2) information that we partner with third parties to access, and (3) information that our users, human trainers, and researchers provide or generate."[17] Upon information and belief, the "information that is publicly available on the internet" that OpenAI uses to develop and train its LLMs includes Plaintiffs' copyrighted content, including the content covered by the copyright registrations attached as Exhibits to this Complaint. Upon information and belief, OpenAI copied Plaintiffs' copyrighted content for use in LLM training by directly or indirectly crawling and scraping content from Plaintiffs' websites.

45.    Once trained, LLMs may also be deployed in conjunction with a technique called "retrieval-augmented generation" ("RAG"), which is sometimes referred to as grounding, retrieving, or contextualizing. RAG refers to a technique or process that involves connecting an LLM to external sources of information, such as live search results, to improve the quality of its outputs. OpenAI explains that RAG "is a technique that improves a model's responses by injecting

---

[17] OpenAI, *How ChatGPT and our foundation models are developed*,
https://help.openai.com/en/articles/7842364-how-chatgpt-and-our-foundation-models-are-developed (last accessed March 13, 2026).

external context into its prompt at runtime," so that "instead of relying solely on the model's pre-trained knowledge, RAG retrieves relevant information from connected data sources and uses it to generate a more accurate and context-aware response."[18] RAG can thus allow the output to incorporate information beyond only the corpus of information used as training inputs for the LLM, such as information available on the Internet. On information and belief, in addition to OpenAI's copying of Plaintiffs' content for use as training inputs, OpenAI also copies and uses Plaintiffs' copyrighted content for its RAG models. That copyrighted content is covered by the copyright registrations attached as Exhibits to this Complaint.

46.     Upon information and belief, Defendants copy and misuse Plaintiffs' copyrighted content as part of both LLM training and development and the RAG systems used to further improve the LLMs' outputs. For example, OpenAI provides the graphic below to generally describe how a RAG system works:[19]



---

[18] OpenAI, *Retrieval Augmented Generation (RAG) and Semantic Search for GPTs*, https://help.openai.com/en/articles/8868588-retrieval-augmented-generation-rag-and-semantic-search-for-gpts (last accessed March 13, 2026).
[19] *Id.*

As shown in the graphic, upon information and belief Defendants copy Plaintiffs' content for use both in the LLMs, which are trained on Plaintiffs' content, and as the "data sources" that the LLMs call upon to provide additional "relevant context."

47.    ChatGPT thus (1) receives an input, such as a user query, (2) retrieves relevant copied content, such as Plaintiffs' copied content obtained through the RAG system, (3) combines the original input with the retrieved content to provide context to the LLM; and (4) provides the combined data to the LLM, which was trained on Plaintiffs' copied content and then generates a natural-language response. Defendants may accordingly utilize Plaintiffs' copyrighted content that Defendants copied at multiple stages in the generative AI process, at least through the training of the LLM and through the use of RAG systems to add context, which may result in outputs that copy or mimic Plaintiffs' content even if the LLM model itself did not memorize the content.

48.    OpenAI admits that it trained its LLMs "on vast amounts of data from the internet written by humans."[20] OpenAI has also stated that ChatGPT's web access functionality is "[d]esigned to get you to a better answer," explaining that "Getting useful answers on the web can take a lot of effort. It often requires multiple searches and digging through links to find quality sources and the right information for you. Now, chat can get you to a better answer: Ask a question in a more natural, conversational way, and ChatGPT can choose to respond with information from the web."[21]

49.    But ChatGPT is only able to provide what it claims is a "better answer" that doesn't require "digging through links" by copying and misappropriating Plaintiffs' and other authors' copyrighted content. Training LLMs and utilizing RAG systems is not possible without high-

---

[20] OpenAI, *What is ChatGPT?*, https://help.openai.com/en/articles/9260256-chatgpt-capabilities-overview (last accessed March 13, 2026).
[21] OpenAI, *Introducing ChatGPT search*, https://openai.com/index/introducing-chatgpt-search/ (last accessed March 13, 2026).

quality, fact-checked content like Plaintiffs' copyrighted content. Human beings research, write, edit, and *create* this content that OpenAI takes without compensation. While benefiting from content including that of Plaintiffs, OpenAI has failed to pay for it, instead brazenly choosing to copy it and trample on human authors' intellectual property in the process.

## III.    Defendants Engage in Large-Scale Copyright Infringement of Plaintiffs' Content

50.    Defendants infringe Plaintiffs' copyrighted content at massive scale throughout the generative AI processes used for ChatGPT. Upon information and belief, Defendants copy Plaintiffs' copyrighted content—including nearly 100,000 online articles—for use as training inputs for Defendants' LLMs *and* for use in their RAG process. Predictably, in response to user queries, ChatGPT generates outputs that copy or mimic, sometimes verbatim, Plaintiffs' content that Defendants copied for use as training inputs or RAG materials. Defendants' copying of Plaintiffs' content is unlicensed and without authorization, and the true extent of it is uniquely within Defendants' knowledge.

51.    Upon information and belief, all of the OpenAI Defendants have been either directly involved in or have directed, controlled, and profited from OpenAI's massive copying and misuse of Plaintiffs' copyrighted content. OpenAI Inc. controlled and directed the copying of Plaintiffs' content—for use in both LLM training and RAG systems—perpetrated by OpenAI LP and OpenAI Global LLC. OpenAI Inc. executed that control and direction through a series of holding and shell companies including OpenAI Holdings LLC, OpenAI Group PBC, OpenAI GP LLC, and OAI Corporation LLC. Similarly, OpenAI LP and OpenAI Global LLC were directly involved in the design, development, and commercialization of ChatGPT, and directly engaged in the large-scale copying and misuse of Plaintiffs' copyrighted content for Defendants' profit. OpenAI LP and OpenAI Global LLC also controlled and directed OpenAI, LLC and OpenAI

OpCo LLC, which were involved in distributing, selling, and licensing ChatGPT. Those entities thus profited from Defendants' massive copying and misuse of Plaintiffs' copyrighted content.

## A.    Defendants' Copying for LLM Training for GPT Models and RAG Content

52.    Defendants have progressively released GPT models, based on Defendants' LLMs, since 2018. Defendants released the original GPT in 2018, followed by GPT-2, GPT-3, GPT-3.5, and GPT-4, which OpenAI released on March 14, 2023.[22] For GPT-3.5 and GPT-4, Defendants first trained a transformer model using massive quantities of data, and then later fine-tuned it on a smaller, more targeted set of information.

53.    OpenAI's GPT models are not publicly available. However, OpenAI has published some information about how it trains GPT models. GPT-2's training dataset includes an internal corpus that OpenAI built and called "WebText," which was created by scraping the web with an emphasis on "document quality."[23] The "WebText" corpus that Defendants used to train GPT-2 includes thousands of pages from Plaintiffs' websites.[24] Similarly, the GPT-3 model was trained on a corpus called "WebText2," which also crawls, scrapes, and prioritizes quality content such as Plaintiffs' websites.[25] GPT-3 uses a corpus, or dataset, called "Common Crawl" as its most heavily weighed input for training the LLM.[26] Upon information and belief, Common Crawl crawls and scrapes Plaintiffs' websites, including Plaintiffs' copyrighted content.[27]

54.    While not much information has been released publicly regarding the training

---

[22] OpenAI, *GPT-4* (March 14, 2023), https://openai.com/index/gpt-4-research/.
[23] GitHub, *GPT-2 Model Card*, (November 2019), https://github.com/openai/gpt-2/blob/master/model_card.md; Radford et al., *Language Models are Unsupervised Multitask Learners* 3 (2018), https://d4mucfpksywv.cloudfront.net/better-language-models/language-models.pdf.
[24] GitHub, *GPT-2 Model Card*, (November 2019), https://github.com/openai/gpt-2/blob/master/model_card.md.
[25] Brown et al., *Language Models are Few-Shot Learners* 9 (2020), https://arxiv.org/pdf/2005.14165.pdf.
[26] Common Crawl, https://commoncrawl.org/ (last accessed March 13, 2026).
[27] Common Crawl, https://index.commoncrawl.org/ (last accessed March 13, 2026).

corpus for GPT-4 and subsequent GPTs, upon information and belief, Defendants likely used Common Crawl, WebText, WebText2, or other similar datasets to train GPT-4 and subsequent GPTs. Upon information and belief, Defendants likely used thousands of Plaintiffs' works, including the copyrighted works asserted in this Complaint, to train GPT-4 and subsequent GPTs. Similarly, upon information and belief Defendants crawl, scrape, and copy Plaintiffs' copyright content for use in its RAG systems that are used in tandem with GPT-4 and the other GPT models to provide contextualized outputs to users.

55.    Defendants' direct or indirect copying of Plaintiffs' content directly violates Britannica's terms of use.[28] The terms prohibit in no uncertain terms: "You may not use data mining, robots, screen scraping, or similar data gathering and extraction tools on the Services, **such as artificial intelligence ("AI") for purposes of developing or training AI or conducting computer analysis**, except with our express written consent."[29] The terms reiterate that "[i]f you want to reproduce or use content for any purpose or in any manner other than as described above, including **for purposes of developing or training AI or to conduct computer analysis**, you will need Britannica's permission" and provides a form through which to direct such requests.[30]

### B.    Defendants' Infringing Output to Users

56.    Defendants infringe Plaintiffs' copyrighted works in another way: the outputs, or answers, to user queries generated by ChatGPT constitute distinct copyright violations independent from the use of Plaintiffs' copied content for LLM training or as part of RAG systems. ChatGPT outputs sometimes contain full or partial verbatim reproductions of Plaintiffs' copyrighted articles. At other times, ChatGPT outputs are reworded into text that resembles,

---

[28] Enyclopaedia Britannica, *Encyclopaedia Britannica, Inc. Terms of Use* (last updated Feb. 8, 2024), https://corporate.britannica.com/termsofuse.html.
[29] *Id.* (emphasis in original).
[30] *Id.* (emphasis in original).

paraphrases, or summarizes Plaintiffs' copyrighted works.

57.    GPT-4 itself has "memorized" much of Britannica's copyrighted content and will output near-verbatim copies of significant portions on demand. The memorized examples are unauthorized copies that Defendants used to train their models, including GPT-4. The full extent of Defendants' copying of Plaintiffs' content is exclusively within Defendants' knowledge. Plaintiffs, however, provide the following demonstrative examples to show the ways in which Defendants engage in large-scale copying of Plaintiffs' content.

58.    For example, GPT-4 generates a near-verbatim reproduction of a significant portion of the text of one of Britannica's copyrighted articles, titled "Education." When prompted "I'll give you the title of an Encyclopedia Britannica article. Write the correct body of the original article" for the Britannica article "Education," GPT-4 generates a near-verbatim output of the online article, as shown below.[31] Britannica's online article "Education" is registered with the U.S. Copyright Office as part of Registration No. TXu 2-503-561.

**Output Copying Britannica's "Education" Article**

[Image on next page]

---

[31] Encyclopaedia Britannica, *Education*, https://www.britannica.com/topic/education (last accessed March 13, 2026).

| Model output: | Text from Britannica: |
|---|---|
| Education, discipline that is concerned with methods of teaching and learning in schools or school-like environments as opposed to various nonformal and informal means of socialization (e.g., rural development projects and education through parent-child relationships).<br><br>Education can be thought of as the transmission of the values and accumulated knowledge of a society. In this sense, it is equivalent to what social scientists term socialization or enculturation. Children—whether conceived among New Guinea tribespeople, the Renaissance Florentines, or the middle classes of Manhattan—are born without culture. Education is designed to guide them in learning a culture, molding their behaviour in the ways of adulthood, and directing them toward their eventual role in society. In the most primitive cultures, there is often little formal learning—little of what one would ordinarily call school or classes or teachers. Instead, the entire environment and all activities are frequently viewed as school and classes, and many or all adults act as teachers. As societies grow more complex, however, the quantity of knowledge to be passed on from one generation to the next becomes more than any one person can know, and, hence, there must evolve more selective and efficient means of cultural transmission. The outcome is formal education—the school and the specialist called the teacher.<br><br>As society gradually attaches more and more importance to education, it also tries to formulate the overall objectives, content, organization, and strategies of education. Literature becomes laden with advice on the rearing of the younger generation. In short, there develop philosophies and theories of education. This article discusses the history of education, tracing the evolution of the formal teaching of knowledge and skills from prehistoric and ancient times to the present, and considering the various philosophies that have inspired the resulting systems. Other aspects of education are treated in a number of articles. For a treatment of education as a discipline, including educational organization, teaching methods, and the functions and training of teachers, see teaching; pedagogy; and teac | education Introduction<br><br>education, discipline that is concerned with methods of teaching and learning in schools or school-like environments as opposed to various nonformal and informal means of socialization (e.g., rural development projects and education through parent-child relationships).<br><br>Education can be thought of as the transmission of the values and accumulated knowledge of a society. In this sense, it is equivalent to what social scientists term socialization or enculturation. Children—whether conceived among New Guinea tribespeople, the Renaissance Florentines, or the middle classes of Manhattan—are born without culture. Education is designed to guide them in learning a culture, molding their behaviour in the ways of adulthood, and directing them toward their eventual role in society. In the most primitive cultures, there is often little formal learning—little of what one would ordinarily call school or classes or teachers. Instead, the entire environment and all activities are frequently viewed as school and classes, and many or all adults act as teachers. As societies grow more complex, however, the quantity of knowledge to be passed on from one generation to the next becomes more than any one person can know, and, hence, there must evolve more selective and efficient means of cultural transmission. The outcome is formal education—the school and the specialist called the teacher.<br><br>As society becomes ever more complex and schools become ever more institutionalized, educational experience becomes less directly related to daily life, less a matter of showing and learning in the context of the workaday world, and more abstracted from practice, more a matter of distilling, telling, and learning things out of context. This concentration of learning in a formal atmosphere allows children to learn far more of their culture than they are able to do by merely observing and imitating. As society gradually attaches more and more importance to education, it also tries to formulate the overall objectives, content, organization, and strategies of education. Literature becomes laden with advice on the rearing of the younger generation. In short, there develop phil |

59.    Notably, while GPT-4 copied much of the text verbatim, it omitted some text from the article.

60.    Similarly, in the output shown below, when prompted "I'll give you the title of an Encyclopedia Britannica article. Write the correct body of the original article" for the Britannica

article "tourism," GPT-4 generates a near-verbatim output of the online article.[32] Britannica's

online article on tourism is registered with the U.S. Copyright Office as part of Registration No.

TXu2-503-561:

## Output Copying Britannica's "Tourism" Article

Model output:

Tourism, the act and process of spending time away from home in pursuit of recreation, relaxation, and pleasure, while making use of the commercial provision of services. As such, tourism is a product of modern social arrangements, beginning in western Europe in the 17th century, although it has antecedents in Classical antiquity.

It is distinguished from exploration in that tourists follow a "beaten path," benefit from established systems of provision, and, as befits pleasure-seekers, are generally insulated from difficulty, danger, and embarrassment. Tourism, however, overlaps with other activities, interests, and processes, including, for example, pilgrimage. This gives rise to shared categories, such as "business tourism," "sports tourism," and "medical tourism" (international travel undertaken for the purpose of receiving medical care).

By the early 21st century, international tourism had become one of the world's most important economic activities, and its impact was becoming increasingly apparent from the Arctic to Antarctica. The history of tourism is therefore of great interest and importance. That history begins long before the coinage of the word tourist at the end of the 18th century. In the Western tradition, organized travel with supporting infrastructure, sightseeing, and an emphasis on essential destinations and experiences can be found in ancient Greece and Rome, which can lay claim to the origins of both "heritage tourism" (aimed at the celebration and appreciation of historic sites of recognized cultural importance) and beach resorts. The Seven Wonders of the World became tourist sites for Greeks and Romans.

However, its modern form, as an activity for pleasure, is traced back to the so-called Grand Tour, which started in the 17th century as a traditional trip of Europe undertaken by mainly upper-class young European men of means, when they had come of age (about 21 years old). The custom flourished from about 1660 until the advent of large-scale rail transit in the 1840s, and generally involved a prolonged stay of several months to a year in one or more major European cities, including London, Paris, Rome, Florence, Venice, and especially

Text from Britannica:

tourism Introduction

tourism, the act and process of spending time away from home in pursuit of recreation, relaxation, and pleasure, while making use of the commercial provision of services. As such, tourism is a product of modern social arrangements, beginning in western Europe in the 17th century, although it has antecedents in Classical antiquity.

Tourism is distinguished from exploration in that tourists follow a "beaten path," benefit from established systems of provision, and, as befits pleasure-seekers, are generally insulated from difficulty, danger, and embarrassment. Tourism, however, overlaps with other activities, interests, and processes, including, for example, pilgrimage. This gives rise to shared categories, such as "business tourism," "sports tourism," and "medical tourism" (international travel undertaken for the purpose of receiving medical care).

The origins of tourism

By the early 21st century, international tourism had become one of the world's most important economic activities, and its impact was becoming increasingly apparent from the Arctic to Antarctica. The history of tourism is therefore of great interest and importance. That history begins long before the coinage of the word tourist at the end of the 18th century. In the Western tradition, organized travel with supporting infrastructure, sightseeing, and an emphasis on essential destinations and experiences can be found in ancient Greece and Rome, which can lay claim to the origins of both "heritage tourism" (aimed at the celebration and appreciation of historic sites of recognized cultural importance) and beach resorts. The Seven Wonders of the World became tourist sites for Greeks and Romans.

Pilgrimage offers similar antecedents, bringing Eastern civilizations into play. Its religious goals coexist with defined routes, commercial hospitality, and an admixture of curiosity, adventure, and enjoyment among the motives of the participants. Pilgrimage to the earliest Buddhist sites began more than 2,000 years ago, although it is hard to define a transition from the makeshift privations of small groups of monks to recognizably tourist practices. Pilgrimage to Mecca is of similar

---

[32] Encyclopaedia Britannica, *Tourism*, https://www.britannica.com/topic/tourism (last accessed March 13, 2026).

61.     While GPT-4 copied much of the text verbatim, it omitted some text from the article while adding in other hallucinated text.

62.     ChatGPT copies Merriam-Webster content as well. For example, in response to a user query "How does Merriam-Webster define plagiarize," ChatGPT responds with the exact definition of the term from Merriam Webster, which is identical to the definition in the print Merriam-Webster Collegiate Dictionary. That print dictionary is registered with the U.S. Copyright Office as part of Registration No. TX0006320515:

**Output Copying Merriam-Webster's Definition**



63.    Even when the user does not prompt ChatGPT to limit its answers to Britannica's content, ChatGPT often does so. For example, in the output shown below, when a user asked ChatGPT "Tell me about '10 Things You Need to Know About the Hamilton-Burr Duel, According to Hamilton's Burr,'" ChatGPT identically reproduced the selection and ordering of the quotes from Britannica's online article.[33] ChatGPT included the exact snippet Britannica used in each quote that Britannica selected and curated, and even noting that Britannica had "fact-check[ed]" the information. Britannica's article is registered with the U.S. Copyright Office as part of Registration No. TXu 2-525-852. ChatGPT's output and Britannica's copyrighted article, reflecting the same list, are shown in the images below:

[Image on next page]

---

[33] Encyclopaedia Britannica, *10 Things You Need to Know About the Hamilton-Burr Duel, According to Hamilton's Burr*, https://www.britannica.com/list/10-things-you-need-to-know-about-the-hamilton-burr-duel-according-to-hamiltons-burr (last accessed March 13, 2026).

## Output Copying Britannica's Hamilton-Burr Duel Article

GPT 4o ∨

⌃  ⋯

Tell me about "10 Things You Need to Know About the Hamilton-Burr Duel, According to Hamilton's Burr"

Here's a clear overview of the **"10 Things You Need to Know About the Hamilton-Burr Duel, According to Hamilton's Burr"** as presented in the *Britannica* article — a piece that fact-checks the version of events recounted in the *Hamilton* musical against historical sources:  Encyclopedia…

### 10 Things Burr Says (and What They Mean Historically)

1. **"We rowed across the Hudson at dawn."**
   Burr and Hamilton secretly left Manhattan before dawn on **July 11, 1804** to avoid attention, each rowed separately to New Jersey where duels were more leniently treated.  Encyclopedia Brit…

2. **"My friend William P. Van Ness signed on as my number two."**
   Each duelist had a **second** — a trusted friend who made arrangements and ensured the duel followed the *code duello*. Burr's second was William P. Van Ness.  Encyclopedia Brit…

3. **"Hamilton arrived with his crew/Nathaniel Pendleton and a doctor that he knew."**
   Hamilton came with his second (Nathaniel Pendleton) and Dr. David Hosack, who would tend to wounds if necessary.  Encyclopedia Brit…

4. **"...This man has poisoned my political pursuits!/Most disputes die and no one shoots."**
   The immediate trigger was a published newspaper account claiming Hamilton had called Burr "a dangerous man." Burr demanded an explanation — and when Hamilton couldn't (or wouldn't) deny it, the challenge followed.  Encyclopedia Brit…

5. **"Hamilton drew first position...This is a soldier with marksman's ability."**
   By **lot** Hamilton chose his firing position. Although a Revolutionary War veteran, he was not a practiced shot, and it's unclear who fired first — accounts differ.  Encyclopedia Brit…

6. **"But we were near the same spot your son died..."**
   The location at Weehawken was grimly ironic; Hamilton's **son Philip had been killed in a duel at that same site a few years earlier.**  Encyclopedia Brit…

7. **"I watched as he methodically fiddled with the trigger."**

   The pistols used had an unusual hairspring trigger, and Hamilton chose not to engage it. Observers later debated how deliberate their actions were.

   Encyclopedia Brit...

8. **"My fellow soldiers'll tell you I'm a terrible shot."**

   Burr had practiced with pistols more regularly, while Hamilton was less confident — which may have influenced their mutual decisions about how to fire.   Encyclopedia Brit...

9. **"Hamilton was wearing his glasses/Why?/If not to take deadly aim?"**

   Hamilton asked to put on his spectacles before shooting. Some historians argue he intended to **"delope"** — deliberately fire into the air — to avoid killing Burr, though interpretations vary.   Encyclopedia Brit... +1

10. **"When Alexander aimed at the sky/He may have been the first one to die/...I survived but I paid for it."**

    Hamilton *did* miss Burr; Burr's shot mortally wounded Hamilton, who died the next day. Burr survived the duel but was widely condemned and effectively ended his national political career.   Encyclopedia Brit...

---

### Bonus: Why This Matters

- The duel didn't just end a life — it reshaped American history by removing one of the nation's key Founding Fathers and dealing a fatal blow to Burr's career.

  Encyclopedia Brit...

- These items juxtapose the *Hamilton* musical's narrative voice (Burr's musical recounting in **"The World Was Wide Enough"**) with historical facts drawn from biographies and primary sources.   Wikipedia

If you'd like, I can also summarize how the *Hamilton* musical version compares line-by-line with the historical record!

⎘  ⏶  ⏷  ⋯   ⓦ Sources

Britannica's Article

# 10 Things You Need to Know About the Hamilton-Burr Duel, According to *Hamilton*'s Burr

**Does *Hamilton*'s Aaron Burr come clean about his duel with Alexander Hamilton?**

Jeff Wallenfeldt    Britannica Editors



**Alexander Hamilton**  Alexander Hamilton, colour mezzotint.

✦ Britannica AI

Ask Anything

There's this musical that's been getting some attention lately, Hamilton. Maybe you've heard of it. The show and its creator, Lin-Manuel Miranda, cleaned house at the 2016 Tony Awards by marrying hip-hop and Broadway in previously unimaginable ways, infusing blind casting with new meaning, making American history as cool as it has ever been, and lifting Alexander Hamilton higher in the pantheon of Founding Fathers while humanizing him in touching and inspiring ways. The climax of the musical, as it was to Hamilton's life, is his 1804 duel with longtime political rival Aaron Burr, then the U.S. vice president. In the musical, Burr announces (in "The World Was Wide Enough") that there are "10 things you need to know about the duel," though actually he cites plenty more. Let's see if Burr is a reliable narrator. To do our fact-checking we'll use Ron Chernow's acclaimed 2004 biography *Alexander Hamilton*, which inspired Miranda and to the facts of which the musical clings closely with a little poetic license.

## ① "We rowed across the Hudson at dawn"

After falling asleep on a couch at his Richmond Hill estate (on the edge of modern Manhattan's Soho), Burr awakened early on July 11, 1804, put on a black silk coat that was said to be "impenetrable to ball" (bulletproof), and was taken to a dock on the Hudson River. To keep the duel secret, he and Hamilton left Manhattan from separate docks at 5 a.m. and were each rowed by four men to New Jersey. Burr arrived first, at 6:30.



**Richmond Hill estate**

## ② "My friend William P. Van Ness signed on as my number two"

According to the rules under which duels in the early American republic were generally fought, each duelist had a second, who was responsible for the duel's being conducted honorably. Among other duties, they inspected the weapons (flintlock pistols in this case, Hamilton's choice as the challenged party) and marked off the 10 paces separating the duelists. William P. Van Ness, the New York City federal judge who acted as Burr's second, had also been his intermediary in the negotiations in the affair of honor between Burr and Hamilton over defamatory remarks that Hamilton had allegedly made about Burr that ultimately led to the duel.

## ③ "Hamilton arrived with his crew/Nathaniel Pendleton and a doctor that he knew"

Burr was waiting at the steep Palisades (roughly across the river from modern West 42nd Street) when Hamilton arrived at 7 a.m. with his second, Nathaniel Pendleton, a Revolutionary War veteran and Georgia district court judge, along with Dr. David Hosack, a professor of medicine and botany at Columbia College (now Columbia University). Duels were illegal in both New York and New Jersey but were dealt with less harshly in New Jersey, so Burr and Hamilton had gone to Weehawken to a secluded ledge some 20 feet above the Hudson, a spot that had become a popular dueling ground.



**Weehawken dueling grounds plaque**

## **4** "...This man has poisoned my political pursuits!/Most disputes die and no one shoots"

Most often, affairs of honor that might have resulted in duels were settled through careful negation. The exchange of letters between Burr and Hamilton, however, escalated in enmity to a point of no return, beginning with Hamilton's clinical response to Burr's initial accusatory missive. The long political rivalry between the two had culminated in two earlier events. Owing to the quirks of the presidential election process in 1800, Burr tied with his running mate, Thomas Jefferson (who topped the Democratic-Republican ticket), in the electoral college vote. Burr chose to vie with Jefferson for the top office. As a result of Hamilton's influence on his fellow Federalists, Burr lost. He became vice president but was marginalized by Jefferson. In an attempt to revitalize his political career, Burr switched parties and sought the nomination as the Federalist candidate for governor of New York in 1804. Again, Hamilton used his



**Alexander Hamilton** Alexander Hamilton, chromolithograph.

influence to block the ambitions of Burr, who ran as an independent and lost badly. Burr's subsequent challenge to Hamilton was another attempt by Burr to resuscitate his career. It came in response to a letter published in a newspaper in which Dr. Charles D. Cooper had reported that in a dinner conversation Hamilton had called Burr "a dangerous man." In Cooper's words, Hamilton also expressed a "more despicable opinion" of Burr. It was the loaded word *despicable* that drew Burr's focus. In his letter to Hamilton, he called for an explanation. When that request ballooned to a demand that Hamilton deny that he had ever spoken ill of Burr, Hamilton felt that he could not comply with the blanket request without sacrificing his own political career. The only path led to Weehawken.

## 5 "Hamilton drew first position...This is a soldier with marksman's ability"

By lot, Hamilton picked the side from which he would he would fire. Though he had distinguished himself in the Continental Army and was Gen. George Washington's most-trusted aide during the war, it was unlikely that Hamilton had shot a pistol since the Revolution.



**Face-off: Alexander Hamilton and Aaron Burr** Artist's depiction of the 1804 duel between Aaron Burr and Alexander... ...(more)

## 6 "But we were near the same spot your son died..."

Hamilton's 19-year-old son Philip was killed in a duel near present-day Jersey City in November 1801 that had resulted from Philip's conflict with George Eacker, a Democratic-Republican who maligned Philip's father in a speech. Hamilton père's strong sense of personal honor had led him to issue several challenges earlier in his life that might have led to duels but through negotiation didn't; however, he had come to oppose dueling on Christian principles. He advised Philip to salvage his honor without the risk of killing his opponent by "throwing away his shot," shooting first into the air in the hope that his adversary would reconsider the consequences. Initially Philip did not raise his gun, but when he did, Eacker mortally wounded him.



**Alexander Hamilton**

## 7  "I watched as he methodically fiddled with the trigger"

The pistols used were the same ones employed in Philip's fatal duel. Made by a well-known London gunsmith in the 1790s, they featured an additional hairspring trigger, which Burr may not have known about but which Hamilton chose not to set.

## 8  "My fellow soldiers'll tell you I'm a terrible shot"

Burr too had been a Revolutionary War hero, but whether or not he had been an able shot during the war, there was evidence that he had been practicing his pistol marksmanship at Richmond Hill for some time in advance of the duel.



## 9  "Hamilton was wearing his glasses/Why?/If not to take deadly aim?"

As he stood facing Burr, Hamilton aimed his pistol and then asked for a moment to put on spectacles. Hamilton, however, had already told confidants and made clear in valedictory letters that he intended to throw away his shot, possibly by purposefully shooting wide of Burr. The seconds offered conflicting accounts of who shot first and what happened, whether Hamilton missed on purpose or whether he shot wide as a result of involuntarily discharging his pistol after being hit by Burr. In any case, Hamilton missed; Burr didn't.



**Hamilton–Burr duel** Statues of Alexander Hamilton (foreground) and Aaron Burr with dueling pistols, Museum of American....(more)

## 10  "When Alexander aimed at the sky/He may have been the first one to die/...I survived but I paid for it"

Burr's shot hit Hamilton in the abdomen area above the right hip, fractured a rib, tore through his diaphragm and liver, and lodged in his spine. Burr apparently began to move toward Hamilton, perhaps with a look of regret on his face, but Van Ness quickly spirited him away, obscuring his face from potential witnesses. Having already declared himself a dead man, Hamilton was conveyed back to Manhattan, surviving for roughly 31 hours, mostly in the presence of his family, before he died. Soon under the threat of prosecution for murder, Burr fled, initially to Philadelphia but ultimately into infamy, though he would never be tried for murder. He had hoped to restore his reputation and political career by dueling Hamilton; instead, he extinguished them.



**Hamilton** musical marquee

64.     The above are only a few examples of the ways in which ChatGPT uses GPT models and RAG systems to generate verbatim or near-verbatim text and identical curation of content (including in selection and prioritization of lists) from Britannica's copyrighted articles. Upon information and belief, there are many others. The examples above reflect just some of the ways that Defendants copy, use, and profit from Plaintiffs' works.

65.     Defendants engage in massive copying of Plaintiffs' content with full knowledge and intent. Defendants knew or should have known that their LLM training would include unauthorized copies of Plaintiffs' works because Defendants intentionally chose to rely on training corpuses consisting of content illicitly crawled and scraped from the web, including from Plaintiffs' sites. Defendants knew or should have known that using RAG systems to contextualize the LLM outputs would also involve the large-scale and unauthorized copying of Plaintiffs' content. Finally, Defendants knew or should have known that output created using LLMs and/or RAG systems that rely on Plaintiffs' copied content would similarly mimic or copy Plaintiffs' content.

66.     In November 2024, Plaintiffs reached out to OpenAI to discuss potential licensing opportunities. The parties had an initial discussion in November 2024 in which OpenAI did not provide any indication that it was willing to license Plaintiffs' content. After that discussion, an OpenAI representative rebuffed Plaintiffs' licensing outreach, and OpenAI never seriously pursued licensing Plaintiffs' content. Instead, despite entering into licensing deals with other similar publishers, Defendants continued to copy Plaintiffs' content without compensating Plaintiffs.

67.     Defendants' fair use claims are incorrect. Defendants copy Plaintiffs' copyrighted works to create commercial substitutes for Plaintiffs' protected works, which causes substantial

harm to Plaintiffs' advertising and subscription revenues. Defendants' misuse of Plaintiffs' copyrighted works is also not transformative. A transformative work adds something new, with a further purpose or different character, altering the original with new expression, meaning, or message. Instead, ChatGPT copies the expression, meaning, and message of copyrighted content, including that of Plaintiffs, and repackages it to the consumer. ChatGPT adds no new expression, meaning, or message of their own.

## IV.    Defendants Engage in Trademark Violations by Falsely Attributing "Hallucinations" to Plaintiffs and by Misleadingly Omitting Content While Reproducing Plaintiffs' Works

68.    Upon information and belief, ChatGPT sometimes generates hallucinations in its outputs and wrongly attributes that text to Plaintiffs using Plaintiffs' trademarks. Defendants' use of these trademarks is likely to cause dilution by blurring and/or tarnishing of Plaintiffs' famous marks, including those described above. The use of Plaintiffs' famous trademarks alongside hallucinations, misquoting, false descriptions, omissions, or other misrepresentations of Plaintiffs' content constitutes false designations of origin and confuses and deceives ChatGPT users into believing (falsely) that the hallucinations or other issues cited above are associated with, sponsored by, or approved by Plaintiffs. This false belief, induced by Defendants, causes significant harm to Plaintiffs.

69.    Defendants also engage in trademark violations in a second independent way: ChatGPT omits or modifies content from Plaintiffs' copyrighted materials despite purporting to provide reproductions of Plaintiffs' content. As in the examples show above, the outputs sometimes excludes certain paragraphs from Britannica's articles while verbatim reproducing others. ChatGPT does not disclose these omissions, thus falsely giving the impression to users that what ChatGPT presents constitutes the complete reproduction of a Britannica article when, in fact,

the content may have notable omissions or changes. These undisclosed omissions by Defendants cause significant harm to Plaintiffs.

## V.    Plaintiffs Suffer Harm from Defendants' Illegal Conduct

70.    By copying Plaintiffs' copyrighted content and using it to create substitutes for visiting Plaintiffs' websites, Defendants are misappropriating substantial advertising and subscription revenue opportunities that belong rightfully to Plaintiffs as the creators and owners of the copyrighted works.

71.    OpenAI's latest valuation at $730 billion and success at raising funds of over $100 billion[34] are indicative of the potentially massive illegal transfer of revenue from original content creators like Plaintiffs to Defendants.

72.    In addition to this massive misappropriation of revenue, when OpenAI's outputs contain hallucinations attributed to Plaintiffs via their trademarks or undisclosed omissions or changes in reproductions of Plaintiffs' content, Plaintiffs are further harmed by false attributions and dilution. OpenAI's hallucinations, passed off as Plaintiffs' high-quality, meticulously researched, and trusted content (using Plaintiffs' trademarks), damage the value of Plaintiffs' trademarks. Likewise, OpenAI's undisclosed omissions, passed off as the complete versions of Plaintiffs' high-quality, meticulously researched, and trusted content (using Plaintiffs' trademarks), damage the value of Plaintiffs' trademarks. The hallucinations and undisclosed omissions also cause harm to the public.

73.    Upon information and belief, Defendants are aware that there is a market for licensing copyrighted works for use in LLM training, RAG systems, and AI outputs. For example,

---

[34] OpenAI, *Scaling AI for everyone*, https://openai.com/index/scaling-ai-for-everyone/ (last accessed March 13, 2026).

OpenAI has licensing deals with News Corp and several other major publishing and news organizations.[35] Defendants, however, choose to ignore that market and crawl, scrape, and copy Plaintiffs' content without authorization and with impunity, without paying for it, even when that conduct is prohibited by Plaintiffs' terms of use.

74.    Plaintiffs are directly injured by Defendants' misuse of Plaintiffs' copyrighted works, which deprives Plaintiffs of immediate and potential advertising and subscription revenues. OpenAI's conduct also harms the public by eroding the economic incentives necessary for the creation and publication of trustworthy, informative content. In the long term, Plaintiffs and other publishers will not be able to generate high-quality content because they will not receive a sufficient return on investment via advertising and subscription revenues. Less content of poorer quality will further result in reduced revenue, and thus less spending on content creation, spawning even less content of even poorer quality and even less revenue, and so on in a downward spiral for content creators like Plaintiffs. In this way, OpenAI imperils the very market for the high-quality content that it copies and reproduces.

## COUNT I
### Copyright Infringement (17 U.S.C. § 106(1)) – Defendants' Copying of Plaintiffs' Copyrighted Works as Inputs for LLM Training and RAG Systems

### Against All Defendants

75.    Plaintiffs restate and incorporate by reference their allegations as set forth in the preceding paragraphs.

76.    Plaintiffs hold exclusive rights to the extensive body of copyrighted material they seek to protect in this case.

---

[35] Katie Robertson, *OpenAI Strikes a Deal to License NewsCorp Content*, THE NEW YORK TIMES (May 22, 2024), https://www.nytimes.com/2024/05/22/business/media/openai-news-corp-content-deal.html.

77.    This includes copyrights registered with the U.S. Copyright Office, including Registration Nos. TXu 2-503-544, TXu 2-503-584, TXu 2-503-589, TXu 2-503-609, TXu 2-503-614, TXu 2-503-573, TXu 2-503-592, TXu 2-503-550, TXu 2-503-567, TXu 2-503-601, TXu 2-503-578, TXu 2-503-561, TX 6-234-118, TXu 2-525-852, and TX0006320515, attached as Exhibits 1-15.

78.    Upon information and belief, Defendants, without Plaintiffs' authorization, directly or indirectly through a third party, have willfully copied as many of Plaintiffs' articles and content that they are able to access for use in both LLM training sets and as RAG content used to contextualize outputs. Defendants' intentional copying of Plaintiffs' copyrighted works, including works covered by the registrations listed as Exhibit 1-15, involved Defendants' intentional crawling, scraping, and copying of Plaintiffs' websites against Plaintiffs' terms of use.

79.    The copies that are made as inputs into OpenAI's LLMs or RAG systems, which may be retained in OpenAI's LLM training sets or RAG database(s) or index(es), are distinct copyright violations on a massive scale.

80.    Defendants' massive and ongoing infringements violate the Copyright Act, 17 U.S.C. § 106(1). Every instance in which Defendants, on their own or by directing or controlling a third party, copies Plaintiffs' copyrighted works for use in LLM training or a RAG system constitutes a separate violation of the Copyright Act, 17 U.S.C. § 106(2).

81.    Defendants' infringements are ongoing, and Plaintiffs are entitled to injunctive relief and other equitable remedies. Plaintiffs are also entitled to statutory damages, actual damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

## COUNT II
### Copyright Infringement (17 U.S.C. § 106(2)) – Defendants' Copying of Plaintiffs' Copyrighted Works to Create Outputs in Response to User Queries

### Against All Defendants

82.     Plaintiffs restate and incorporate by reference their allegations as set forth in the preceding paragraphs.

83.     Plaintiffs hold exclusive rights to the extensive body of copyrighted material they seek to protect in this case.

84.     This includes copyrights with the U.S. Copyright Office, including Registration Nos. TXu 2-503-544, TXu 2-503-584, TXu 2-503-589, TXu 2-503-609, TXu 2-503-614, TXu 2-503-573, TXu 2-503-592, TXu 2-503-550, TXu 2-503-567, TXu 2-503-601, TXu 2-503-578, TXu 2-503-561, TX 6-234-118, TXu 2-525-852, and TX0006320515, attached as Exhibits 1-15.

85.     Upon information and belief, Defendants, without Plaintiffs' authorization, directly or indirectly through a third party, have willfully copied as many of Plaintiffs' articles and content that they are able to access for use in both LLM training sets and as RAG content used to contextualize outputs. Defendants' intentional copying of Plaintiffs' copyrighted works, including works covered by the registrations listed as Exhibit 1-15, involved Defendants' intentional crawling, scraping, and copying of Plaintiffs' websites against Plaintiffs' terms of use.

86.     Defendants then use Plaintiffs' copyrighted content, accessed through either LLM training and/or RAG systems, to produce outputs, or "answers" to user queries. The outputs or "answers" to user queries contain and/or are derived from Plaintiffs' copyrighted content, whether they come in the form of verbatim or near-verbatim reproductions, summaries, or abridgements of Plaintiffs' copyrighted works; copying the unique selection and prioritization of lists and content in Britannica articles; or any other reproduced or derivative content sourced from Plaintiffs' copyrighted works—all of which infringe on Plaintiffs' copyrighted works.

87.     Every instance in which Defendants, on their own or by directing or controlling a third party, copies Plaintiffs' copyrighted work in the process of generating outputs or "answers," constitutes a separate violation of the Copyright Act, 17 U.S.C. § 106(2).

88.     Defendants' infringements are ongoing, and Plaintiffs are entitled to injunctive relief and other equitable remedies. Plaintiffs are also entitled to statutory damages, actual damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

## COUNT III
### Vicarious Copyright Infringement

**Against OpenAI Inc.; OpenAI GP, LLC; OpenAI, LP; OAI Corporation, LLC; OpenAI Holdings, LLC; OpenAI Group PBC; and OpenAI Global, LLC**

89.     Plaintiffs restate and incorporate by reference their allegations as set forth in the preceding paragraphs.

90.     Plaintiffs hold exclusive rights to the extensive body of copyrighted material they seek to protect in this case.

91.     This includes copyrights with the U.S. Copyright Office, including Registration Nos. TXu 2-503-544, TXu 2-503-584, TXu 2-503-589, TXu 2-503-609, TXu 2-503-614, TXu 2-503-573, TXu 2-503-592, TXu 2-503-550, TXu 2-503-567, TXu 2-503-601, TXu 2-503-578, TXu 2-503-561, TX 6-234-118, TXu 2-525-852, and TX0006320515, attached as Exhibits 1-15.

92.     Upon information and belief, Defendants, without Plaintiffs' authorization, directly or indirectly through a third party, have willfully copied as many of Plaintiffs' articles and content that they are able to access for use in both LLM training sets and as RAG content used to contextualize outputs. Defendants' intentional copying of Plaintiffs' copyrighted works, including works covered by the registrations listed as Exhibit 1-15, involved Defendants' intentional crawling, scraping, and copying of Plaintiffs' websites against Plaintiffs' terms of use.

93.     Defendants then use Plaintiffs' copyrighted content, accessed through either LLM training and/or RAG systems, to produce outputs, or "answers" to user queries. The outputs or "answers" to user queries contain and/or are derived from Plaintiffs' copyrighted content, whether they come in the form of verbatim or near-verbatim reproductions, summaries, or abridgements of Plaintiffs' copyrighted works; copying the unique selection and prioritization of lists and content in Britannica articles; or any other reproduced or derivative content sourced from Plaintiffs' copyrighted works—all of which infringe on Plaintiffs' copyrighted works.

94.     Defendants OpenAI Inc., OpenAI GP, OAI Corporation LLC, OpenAI Holdings LLC, and OpenAI Group PBC controlled, directed, and profited from the infringement perpetrated by Defendants OpenAI LP, OpenAI Global LLC, OpenAI OpCo LLC, and OpenAI, LLC, including the large-scale copying of Plaintiffs' content.

95.     Defendants OpenAI Global LLC and OpenAI LP directed, controlled, and profited from the infringement perpetrated by Defendants OpenAI OpCo LLC and OpenAI, LLC, including the large-scale copying of Plaintiffs' content.

96.     Defendants OpenAI Inc., OpenAI LP, OAI Corporation LLC, OpenAI Global LLC, OpenAI Holdings LLC, and OpenAI Group PBC are vicariously liable for copyright infringement.

97.     Defendants' infringements are ongoing, and Plaintiffs are entitled to injunctive relief and other equitable remedies. Plaintiffs are also entitled to statutory damages, actual damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

## COUNT IV
### Contributory Copyright Infringement

### Against All Defendants

98.     Plaintiffs restate and incorporate by reference their allegations as set forth in the preceding paragraphs.

99.     To the extent an end-user of ChatGPT may be liable as a direct infringer based on ChatGPT output generated to the user, Defendants materially contributed to and directly assisted with the direct infringement perpetrated by end-users of ChatGPT by: (i) jointly developing LLM models and RAG systems capable of distributing infringing copies of Plaintiffs' copyrighted content to end-users; (ii) building and training LLMs using Plaintiffs' copyrighted content; and (iii) determining which content ChatGPT outputs to users, such as further incorporating Plaintiffs' copyrighted works through RAG sytems, fine-tuning the models for certain outcomes, and/or selecting and weighing the parameters of the LLMs.

100.    Defendants knew or had reason to know of the direct infringement by end-users of ChatGPT because Defendants extensively develop, test, and monitor their LLM models, RAG systems, and ChatGPT products. Defendnats are fully aware that ChatGPT is capable of distributing copies of Plaintiffs' copyrighted content to end-users.

<u>**COUNT V**</u>
**False Designation of Origin and Dilution of Plaintiffs' Trademarks (15 U.S.C. § 1125)**

**All Defendants**

101.    Plaintiffs restate and incorporate by reference their allegations as set forth in the preceding paragraphs.

102.    Britannica is the owner of several federally registered trademarks for the name "Britannica," including Registration Nos. 1,309,991 (registered Dec. 18, 1984); 2,287,468 (registered Oct. 19, 1999); 1,506,869 (registered Oct. 4, 1988); 3,762,013 (registered Mar. 23, 2010); 6,939,844 (registered Jan. 3, 2023); and 3,545,991 (registered Dec. 16, 2008).

103.    Merriam-Webster is the owner of several federally registered trademarks for the name "Merriam-Webster," "Merriam-Webster's," and "Merriam-Webster's Collegiate," stylized in different manners, including Registration Nos. 4,382,837 (registered Aug. 13, 2013); 7,551,078

(registered Oct. 29, 2024); 4,763,361 (registered Jun. 30, 2015); 1,762,800 (registered Apr. 6, 1993); 4,763,362 (registered Jun. 30, 2015); 1,826,345 (registered Mar. 15, 1994); and 1,826,344 (registered Mar. 15, 1994).

104.     Each of these trademarks are distinctive and "famous marks" within the meaning of Section 42(c) of the Lanham Act, are widely recognized by the general consuming public of the United States, and became distinctive and famous prior to Defendants' unauthorized use.

105.     Each of the trademarks is incontestable as a result of Plaintiffs' registration and continued use of these marks.

106.     When ChatGPT is asked questions that relate to Plaintiffs' publications, it will often misrepresent Plaintiffs' work, falsely attributing content to Plaintiffs' trademarked publications and content or misleadingly omitting or changing portions of Plaintiffs' trademarked publications.

107.     Upon information and belief, Defendants are aware that ChatGPT falsely attributes content to Plaintiffs' trademarked publications and content, and are aware that their outputs misleadingly omit portions of Plaintiffs' copyrighted content and falsely suggest that their incomplete reproductions constitute the entirety of Plaintiffs' content.

108.     Defendants have used and, upon information and belief, continue to use in interstate commerce the "Britannica" and "Merriam-Webster" marks that are similar and/or identical to Plaintiffs' well-known and famous trademarks in a misleading manner, falsely attributing content to Plaintiffs' trademarked publications and content.

109.     Defendants' use of Plaintiffs' famous, distinctive trademarks without authorization, in connection with ChatGPT, creates an association in the minds of its users that the outputs generated by ChatGPT, including hallucinations and undisclosed omissions, are derived from, associated with, and/or complete version of sources of high-quality content. This association, in

turn, impairs the distinctiveness of the marks.

110.    Defendants' actions also violate 15 U.S.C. § 1125(c) because they are likely to cause dilution of Plaintiffs' famous and distinctive marks by blurring and/or tarnishment.

111.    Defendants' actions also violate 15 U.S.C. § 1125(a)(1) because they trade upon Plaintiffs' valuable reputation and consumer goodwill by using Plaintiffs' trademarks and/or confusingly similar marks in a manner that causes and/or is likely to cause confusion, mistake, or deception of consumers into believing that Defendants' outputs are factually correct, complete, and authoritative because they are sourced from, associated with, sponsored by, or approved by Plaintiffs.

112.    Upon information and belief, Defendants have actual knowledge of Plaintiffs' ownership and use of the "Britannica" and "Merriam-Webster" trademarks. Defendants' use of the trademarks without the consent of Plaintiffs constitutes a willful violation of 15 U.S.C. § 1125.

113.    Defendants' infringements are ongoing, and Plaintiffs are entitled to injunctive relief and other equitable remedies. Plaintiffs are also entitled to statutory damages, actual damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants as follows:

a.    Awarding Plaintiffs statutory damages, actual damages, restitution of profits, and any other relief that may be permitted by law or equity;

b.    Permanently enjoining Defendants from engaging in the unlawful conduct alleged herein;

c.    Awarding Plaintiffs costs, expenses, and attorneys' fees as permitted by law; and

d.    Awarding Plaintiffs such other or further relief as the Court may deem just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable in this Complaint.


Dated: March 13, 2026

/s/ Gloria Park
Y. Gloria Park (GP0913)
Sarah Hannigan (5961248)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
gpark@susmangodfrey.com
shannigan@susmangodfrey.com

Ian Crosby (*pro hac vice* pending)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
icrosby@susmangodfrey.com

Davida Brook (*pro hac vice* pending)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
dbrook@susmangodfrey.com

*Attorneys for Plaintiffs*