INSTITUTE FOR INTELLECTUAL PROPERTY & SOCIAL JUSTICE

October 30, 2026

VIA ECF
The Honorable Sidney H. Stein
United States District Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

**Subject**: Motion for leave to file amicus curiae brief in *In Re: OpenAI, Inc. Copyright Infringement Litigation,* (1:25-md-03143-SHS-OTW).

Dear Judge Stein:

Amici Curiae Institute for Intellectual Property and Social Justice shall and hereby move, pursuant to Fed. R. Civ. P. 7(b) and Local Rules 7-1 and 7-2, for leave to file the proposed brief amici curiae in connection with the motion for summary judgment filed in this Court on September 26, 2026 (ECF No. 1977). The Brief is annexed to this letter motion (the “Motion”) as Exhibit A and, should this Motion be granted, Amici request that the Brief be deemed to have been filed as of the date of this Motion.

**I.** Interests of the Institute for Intellectual Property and Social Justice (“IIPSJ”)

The Institute for Intellectual Property and Social Justice (“IIPSJ”) promotes social justice in the field of intellectual-property law and practice, including copyright, both domestically and globally. Through core principles of socially equitable access, inclusion, and empowerment, intellectual property social justice advances the social policy objectives that underlie intellectual-property protection: the broadest stimulation of creative and innovative endeavor and the widest dissemination of creative works and innovative accomplishments for the greater social good.

Amici Lateef Mtima and Steven Jamar are law professors with expertise in copyright law and have no personal interest in the outcome of this case. They share a professional interest in seeing copyright law applied in ways that serve the broader public interest in the United States, consistent with the Copyright Clause’s explicit goal of promoting the progress of science and the implicit objective of serving social justice. Amici have written, taught, and lectured extensively on topics in copyright, including fair use. Because of their expertise and experience with the issues raised by this case, particularly the implications for copyright social justice, Amici

are uniquely positioned to provide the Court with a perspective that reflects the broader public interest in the application of copyright's fair use doctrine to the instant issues.

Lateef Mtima is a Professor of Law at Howard University School of Law. Throughout his legal career, he has dedicated his work to ensuring that copyright laws are developed in ways that advance progress and the public interest, including the preservation of the social obligations and effects of copyright protection. Mtima's current research focuses on how copyright law should apply to important issues regarding the achievement of copyright social justice. *See, e.g.,* Lateef Mtima, *Copyright Social Justice in the Service of Art: Lessons from Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 38 Harvard Journal of Law and Technology 697 (2024).

Steven D. Jamar is Professor Emeritus, retired from Howard University School of Law. He has published and taught about legal issues that AI models present including some in intellectual property, especially copyright. Throughout his legal career he has dedicated his work to ensuring copyright laws are developed in ways that advance progress and the public interest, including the preservation of the social obligations and effects of copyright protection. Jamar's recent research focuses on how copyright law should apply to important issues regarding artificial intelligence models.

## II. Argument

The Court enjoys great discretion to grant leave for the filing of an amicus brief. *NetChoice, LLC v. Bonta*, 2023 WL 6131619, at *1 (N.D. Cal. Sept. 18, 2023). "The 'classic role' of amici curiae encompasses 'assisting in a case of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration.'" *Id.* at *1 (citing *Miller-Wohl Co. v. Comm'r of Labor & Indus. State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982)); *see also NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005) ("District courts frequently welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved or if the amicus has 'unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide.'") (internal citation omitted). The ultimate factor is whether the amicus brief is "useful to the Court." *Netchoice*, 2023 WL 6131619, at *1.

Amici Copyright Law Professors respectfully submit their proposed Brief amply satisfies this standard. They are disinterested legal scholars whose research and scholarship focus on the legal issues raised in this case. Amici's brief analyzes important copyright issues, including the self-actualization interests of authors in their creative achievements, and the equally important and reciprocal self-actualization interests of the public in enhancing access to the knowledge and intellectual inspiration that can be provided by such achievements.

**III.** Conclusion

For the foregoing reasons, the IIPSJ respectfully requests leave to file a brief as amicus curiae in the above-captioned case. In the interests of efficiency, and in the event the Court deems it appropriate to accept the motion or the proposed amicus curiae brief without further delay, enclosed with this letter under Exhibit A are copies of the proposed amicus curiae brief and under Exhibit B, a proposed order granting the IIPSJ's motion for leave to file the amicus curiae brief.

Sincerely,

*/s/* Lateef Mtima
Lateef Mtima
Respectfully submitted,

Lateef Mtima (Atty# 2083129)
lmtima@iipsj.org
Howard University School of Law
2900 Van Ness Street NW
Washington D.C. 20008

*Counsel for Amici Curiae Institute for Intellectual Property and Social Justice*

CC: All counsel of record via ECF

# Exhibit A

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

IN RE OPEN AI

COPYRIGHT LITIGATION

25-md-3143 (SHS) (OTW)

**AMICUS BRIEF OF**
**THE INSTITUTE FOR INTELLECTUAL PROPERTY AND SOCIAL JUSTICE**
**IN SUPPORT OF NEITHER PARTY**

## RULE 29 STATMENT

No party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief. No person other than amici and their counsel contributed money that was intended to fund preparing or submitting the brief. See Fed. R. App. P. 29(a)(4)(E).

## STATEMENT OF INTEREST OF AMICUS CURIAE

The Institute for Intellectual Property and Social Justice ("IIPSJ") promotes social justice in the field of intellectual-property law and practice, including copyright, both domestically and globally. Through core principles of socially equitable access, inclusion, and empowerment, intellectual property social justice advances the social policy objectives that underlie intellectual-property protection: the broadest stimulation of creative and innovative endeavor and the widest dissemination of creative works and innovative accomplishments for the greater social good.

## SUMMARY OF ARGUMENT

IIPSJ submits this amicus brief to highlight how important issues of copyright social justice, issues which transcend the traditional and largely economic utility framing of the tensions that can arise between authors rights and the advent of new technological uses for copyrighted works, are implicated by the present motion. While the competing remunerative and related pecuniary interests of authors and users are important dimensions of expressive work dissemination and enterprise, there are also "extra-economic" considerations equally essential to the fulfillment of the social justice imperatives of widespread and equitable access to, inclusion within, and socio-economic empowerment through the copyright ecosystem. Among other things, the self-actualization interests of authors in receiving attribution for and preserving the integrity of their creative achievements, and the equally important and reciprocal self-actualization interests of the public in enhancing

access to the knowledge and intellectual inspiration that can be provided by such achievements, intersect here to present unprecedented copyright social justice challenges and opportunities. Moreover, these "extra-economic" interests of authors and the public can be especially acute in marginalized communities, wherein authors and users alike often lack access to both the legal protections and the knowledge, library, and cultural resources available to mainstream communities. The unique nature of the way LLM-based AIs work with their use of materials in their training and their responses to human queries can make analogizing to existing copyright principles particularly difficult in these contexts. IIPSJ respectfully submits its amicus brief to assist the Court in the identification and assessment of the unique challenges and prospects for fulfilling the overarching social justice goals of copyright protection presented by this litigation.

**ARGUMENT**

Courts recognize the important social justice obligations, benefits, and societal aspirations that exist in determining the extent of copyright protection, especially with respect to fair use. *See e.g. Andy Warhol Foundation Visual Arts v. Goldsmith*, 598 U.S. 508, 516, 143 S. Ct. 1258 (2022) (noting the importance of public recognition to a pioneering female rock music photographer for her groundbreaking professional and artistic achievements); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 102-103 (2d Cir. 2014) (acknowledging the benefit to copyright social utility as well as the broader social benefits to be derived from rendering printed copyrighted works widely accessible to the blind and visually impaired). Judicial recognition of these interests and effects as important to the social efficacy of copyright, illuminates the essential function of social justice in promoting constitutional injunction to Congress granting it the power to provide copyrights to secure "the progress of science and useful arts." U.S. Const., Article I, Section 8. *See The Authors Guild et. al. v. Google Inc.*, 770 F. Supp. 2d 666, 679 n.15 (S.D.N.Y 2011) (Noting that the core

social utility function of copyright protection of advancing knowledge and culture is enhanced through inclusion in the copyright ecosystem of those who have been historically excluded or marginalized, *quoting*, Lateef Mtima & Steven D. Jamar, *Fulfilling the Copyright Social Justice Promise: Digitizing Textual Information*, 55 N.Y.L. Sch L. Rev. 77, 79-80 (2010).

A significant and growing body of legal scholarship explores the relationship between copyright social utility and social justice.[1] Maximizing the quantitative and qualitative expressive output available to society requires the broadest possible participation in the production, dissemination, and use of expressive works. Consequently, promulgation and application of copyright law should deliberately and expressly consider, acknowledge, and remediate systemic, exclusionary effects manifest in the copyright ecosystem.[2] And in the past two decades courts and scholars have increasingly done exactly that.[3] Under this IP-social justice approach, the promulgation and implementation of copyright law should inculcate the social justice values of equitable access, inclusion, and empowerment, to ensure that the social goals as well as the economic utility aspects of copyright are achieved.[4]

---

[1] *See generally* THE CAMBRIDGE HANDBOOK OF INTELLECTUAL PROPERTY AND SOCIAL JUSTICE (Steven D. Jamar & Lateef Mtima eds., Cambridge Univ. Press 2024); Peter Menell, *Property, Intellectual Property, and Social Justice: Mapping the Next Frontier*, 5 PROP. RIGHTS CONF. J. 147, 186–93 (2016); Elizabeth L. Rosenblatt, *Social Justice and Copyright's Excess*, 6 TEXAS A&M J. PROP. L. 5, 15–20 (2020); Lateef Mtima, *IP Social Justice Theory: Access, Inclusion, and Empowerment*, 55 GONZ. L. REV. 401, 410–16 (2020).

[2] Sharon Sandeen, *The Value of Irrationality in the IP Equation*, *in* INTELLECTUAL PROPERTY LAW: ECONOMIC AND SOCIAL JUSTICE PERSPECTIVES 63 (2010): The policy question that arises [where marginalized communities do not participate in the IP system] is whether people will value a system from which they are excluded. If a substantial number of people cannot benefit directly from a system of IPRs, how likely are they to engage in the inventive and creative endeavors that it is supposed to inspire? Of equal importance, how likely are they to respect the IPRs of others?;

[3] *See e.g. The Authors Guild et. al. v. Google Inc.*, 770 F. Supp. 2d 666, 679 n.15 (S.D.N.Y 2011); *Williams v. Bridgeport Music, Inc.,* 2014 WL 7877773 (C.D. Cal.); *Blurred Lines of Copyright*, ETHICS UNWRAPPED, https://ethicsunwrapped.utexas.edu/case-study/blurred-lines-copyright [https://perma.cc/Q8XZ-KN4V] (discussing successful litigation by the Estate of Marvin Gaye in connection with pop hit *Blurred Lines*).

[4] Moreover, some scholars urge that copyright social utility extends beyond quantifiable metrics of access and participation, and further requires qualitative social benefits. *See* Alina Ng, *The Motivation Paradox: Exploring Copyright's Assumptions About Creativity and the Allocation of Creative Resources*, 10 TEX. A&M J. PROP. L. 327, 331, 338-39 (2024) "Socially valuable works promoting science's progress should advance society and improve the

Whereas traditional copyright discourse typically assessed achievement of the social utility function of copyright through a narrow lens of economic instrumentalism, the constitutional goal of "progress" requires a more capacious approach. *See* Elizabeth Rosenblatt, *Copyright's One-Way Racial Appropriation Ratchet* ("*One-Way Appropriation*"), 55 U.C. Dav. L. Rev. 591, 599, n.26 (2019) (arguing that "progress" should incorporate notions of "human flourishing," "equality and distributive justice"). While consideration of economic incentives and metrics is useful, restricting assessment to such narrow grounds improperly and needlessly stunts the more complete realization of the constitutional mandate of furthering the social value of copyright. *See* Sean Pager, *Cultivating Capabilities for Creative Industry Upstarts*, 21 Mich. St. Int'l L. Rev. 547, 554 (2013) (arguing against equating "progress" with "wealth maximization"). The incentives and metrics of the commercial marketplace alone cannot account for the range of motives to create or expressive needs and imperatives of society.[5] *See, e.g.*, Elizabeth L. Rosenblatt, *Social Justice & Copyright's Excess* ("*Excess*"), 6 Tex. A&M J. Prop. L. 5 (2020).

Social justice concerns of equitable access to information, inclusion, and empowerment are implicated by LLM-based AI programs in the field of copyright a variety of ways, some of them novel and even perhaps even unique. Due to that novelty of the issues generated both by the very

---

human condition. These works should meet not just a market or technological need but improve social welfare and contribute to the betterment of society. As a normative principle for copyright, creative works that promote the progress of society should meet a social need by imparting knowledge, changing outdated or harmful norms, inspiring action, and facilitating change if copyright takes its mandate of promoting progress seriously. The expression and societal experience of different art forms can play a key role in promoting positive social outcomes."

[5] *See, e.g.*, *It's a Wonderful Life*, WIKIPEDIA, https://en.wikipe dia.org/wiki/It%27s_a_Wonderful_Life [https://perma.cc/FDJ5-Y6SB]: Although it was nominated for five Academy Awards, including Best Picture, *It's a Wonderful Life* initially received mixed reviews and was unsuccessful at the box office. Theatrically, the film's break-even point was $6.3 million, about twice the production cost, a figure it did not come close to achieving on its initial release *It's a Wonderful Life* is now considered to be one of the greatest films of all time and among the best Christmas films. It has been recognized by the American Film Institute as No. 1 on its list of the most inspirational American films of all time [and i]n 1990 was selected for preservation in the United States National Film Registry by the Library of Congress for being deemed as "culturally, historically, or aesthetically significant." *See also* Lateef Mtima, *Copyright Social Justice in the Service of Art: Lessons from Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith,* 38 Harvard Journal of Law & Technology 713-16 (2024) (discussing the "extra-economic" motivations of authors and users to produce and use creative expressive works.)

nature of LLM-based AI models as well as by their use of copyrighted works in training them and the use of them in generating of information, application of the copyright law is best approached through analysis founded on first principles, including IP social justice concerns.

For example, among the problematic and relatively novel concerns are AI models giving patently false answers to factual questions. This "hallucination" problem does a disservice to the user and to the authors whose works are accurate but incorrectly applied by the statistical correlations embedded in the neural network at the core of these AI models. This disservice can be particularly problematic when the works used to train the model are used without the author's knowledge or permission.

But the social justice dimensions connected to the training issues are even more subtle. If works are not allowed to be used to train the AI models, then the curators of the training materials control the direction of the training and the content on which the AI model is trained. This can result in the voices of marginalized communities being minimized or excluded or of less popular views not being included in the training of the models. These exclusions distort the development of the neural nets and consequently result in similarly skewed output.

Many other similar specialized copyright issues are raised by LLM-based AI models both with respect to training and use. The balancing necessary to develop a just approach might best be done by Congress, however, where the courts address these issues, IIPSJ submits that the IP-social justice sensitive approach is the best one to take into account all dimensions of the issues. Copyright as social justice recognizes that copyright's social function transcends the provision of financial rewards and the metrics of commercial success, and extends to promoting human actualization through creative expression and towards society's ultimate benefit.[6]

---

[6] Lateef Mtima & Steven D. Jamar, *Fulfilling the Copyright Social Justice Promise: Digitizing Textual Information*, 55 N.Y.L. SCH. L. REV., 77, 81–82 (2010): Together, the recognized rights and interests of authors and of the public

*Artificial Intelligence, Copyright Social Utility, and Fair Use*

AI makes use of, enhances access to, and generates expressive works and information. The ways in which AI performs each of these activities already impacts, and moreover has the potential to disrupt or enrich the cycle of human expressive work production, dissemination, access, and inspiration in unprecedented ways. Consequently, AI requires a deliberative assessment by the full spectrum of copyright law and policy makers as to how it can be propitiously integrated into the copyright legal regime. As AI's expressive capabilities both compete with and facilitate human creative expressive endeavor, the social pros and cons of AI development and use must be carefully weighed toward maximizing the positive impacts on copyright social utility.

Where AI activity involves unauthorized engagement in one or more of a copyright owner's exclusive rights, such conduct can be held legally permissible if it satisfies the fair use doctrine. Congress has enumerated four factors that guide the fair us inquiry: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. These factors are not assessed in isolation but rather "weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578, (1994). Fair use provides a means by which courts can balance an author's rights against other copyright interests and social objectives, towards ensuring the primacy of copyright's overarching social utility function.

---

are intended to form a synergistic framework to effectuate the social utility objectives of the Copyright Clause - the aim of the copyright law is progress; the means is the granting of limited copyright property rights. The ends sought are the protection of the public interest, progress, and the public good. . . . Copyright is therefore not about profit for the person — it is about 'profit' for society.

In any given case, construing the fair use factors through the lens of economic instrumentalism is an important approach through which to consider the ultimate of a particular activity on the social function of copyright. As discussed above however, it is essential to the preservation of that social function that the fair use balancing of interests and outcomes also be assessed with deference to the social justice obligations and effects of copyright protection.

For example, authors from marginalized communities have historically suffered the systemic, inequitable exploitation of their creative expressive and other intellectual achievements, typically without attribution or compensation, and often in blatant violation of their copyright rights and interests.[7] Copyright as implemented through a narrow lens of economic instrumentalism, indifferent to the realities of extrinsic de jure inequalities, provided little protection for the legal rights and interests of these creators.

At the same time, many of these creators and their communities were also effectively denied access to much of the rich storehouse of copyrighted works available to mainstream society, and thus were deprived of the knowledge, information, and creative inspiration these materials could provide.[8] Fair use rarely closed the copyright access, inclusion, and empowerment gap between the creators and users within these communities and their mainstream copyright counterparts.

In light of this history of copyright inequities, the question of incorporation of AI into the copyright ecosystem presents a Gordian Knot of potential boons and perils for marginalized communities; a blunt slice in either direction, indifferent to the nuanced mandates of copyright social justice, might serve the interests of some copyright constituents, but will more than likely

---

[7] *See e.g., Gee v. CBS,* 471 F. Supp. 600, 610 (E.D. Pa 1979) (rejecting the claims of the heirs of blues legend Bessie Smith for unpaid royalties and other compensation for her work as a recording artist).
[8] *See e.g. A History of Public Libraries*, Digital Public Library of America, https://dp.la/exhibitions/history-us-public-libraries/segregated-libraries

deprive marginalized creators and users of a range of benefits and opportunities difficult to perceive from mainstream vantage points.

Historically the application and assessment of the fair use factors and other copyright protections through a narrow economic utility lens has done little to preserve the rights and interests of many marginalized copyright constituents, much less promote the self-actualization of such creators and users of copyrighted works. IIPSJ respectfully urges that in applying the fair factors to the present issues, the Court consider the copyright social justice implications of AI incorporation into the copyright ecosystem.

## CONCLUSION

Copyright is socially neutered when perceived solely as a mechanism of economic instrumentalism, agnostic toward the social realities extrinsic to the copyright legal regime. For the foregoing reasons, IIPSJ respectfully submits that the application and weighing of the fair use factors to the present issues with due consideration for copyright social justice, will best serve the public's interest in a vibrant and efficacious copyright ecosystem.

Respectfully submitted,
Institute for Intellectual Property and Social Justice
By: *\/s/* Lateef Mtima

Lateef Mtima (Atty# 2083129)
lmtima@iipsj.org
Howard University School of Law
2900 Van Ness Street NW
Washington D.C. 20008

# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br>OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br>ALL CASES | 25-md-3143 (SHS) (OTW)<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang |

**ORDER GRANTING LEAVE TO FILE AMICUS CURIAE BRIEF**

Upon consideration of the Motion for Leave to File Amicus Curiae Brief, **IT IS HEREBY ORDERED**, the Court grants the Office of the Comptroller of the Currency's Motion for Leave to File Brief as Amicus Curiae and its request to participate in oral arguments.

Dated: ___________

___________________________
The Hon. Sidney H. Stein United States District Judge